**Lincoln ADAIR, Antique Prints, Ltd., and Martha Seamans, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**BRISTOL TECHNOLOGY SYSTEMS, INC., Duke & Company, Inc., First Cambridge Securities Corp., Richard H. Walker, Maurice R. Johnson, Paul Spindler and Lawrence Cohen, Defendants.**

No. 97 CIV. 5874(RWS).

United States District Court, S.D. New York.

May 14, 1998.

Rabin & Peckel, New York City (Brian Murray, I. Stephen Rabin, Joseph V. McBride, of Counsel), for Plaintiffs.

O'Sullivan Graev & Karabell, New York City (Joshua H. Epstein, James L. Burns, of Counsel), for Bristol Technology, Richard M. Walker, Maurice R. Johnson, Paul Spindler and Lawrence Cohen.

Daniel E. Katz, New York City, for First Cambridge Securities Corp.

Gersten, Savage, Kaplowitz & Fredericks, New York City (Leslie K. Case, of Counsel), for Duke & Company, Inc.

## OPINION

SWEET, Senior District Judge.

Defendants Bristol Technology Systems, Inc. ("Bristol"), Richard H. Walker, Maurice R. Johnson, Paul Spindler, Lawrence Cohen (the "Individual Defendants" and together with Bristol, the "Bristol Defendants"), First Cambridge Securities Corporation ("First Cambridge"), and Duke & Company, Inc. ("Duke" and together with First Cambridge and the Bristol Defendants, the "Defendants") have moved to dismiss the complaint in this securities fraud class action case (the "Complaint") for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Defendants' motion is denied.

### The Parties

Plaintiffs Lincoln Adair ("Adair"), Antique Prints Ltd. ("Antique Prints"), and Martha Seamans ("Seamans" and collectively, the "Plaintiffs"), filed this action on behalf of themselves and all others similarly situated who bought Bristol common stock ("Stock") and Redeemable Class A Common Stock Purchase Warrants ("Warrants") during the period of November 13, 1996 through May 2, 1997.

Bristol is a Delaware corporation with its principal place of business in Irvine, California. The Individual Defendants are each officers and directors of Bristol. Walker has served as President and Chief Executive Officer, Spindler has served as Chairman of the Board, Executive Vice President and Secretary, and Cohen has served as Vice President of the Board, Executive Vice President, and Treasurer. Johnson has served as Vice President of Bristol since July 1996, and was previously President and a director of Cash Registers, Inc. ("CRI"), a subsidiary of Bristol.

First Cambridge and Duke were underwriters for Bristol's initial public offering (the "IPO").

### Prior Proceedings

Plaintiffs filed the Complaint in this action on August 8, 1997, alleging that the Defendants are liable for (1) issuing a false and misleading registration statement and prospectus in violation of § 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k; and (2) fraud in violation of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5. Specifically, Plaintiffs allege that the registration statement and prospectus is misleading because it failed to disclose: (i) the material trend of increasing losses for Bristol; (ii) that CRI's nine month results [1] for the period ended September 30, 1996 were less than half of what they were for the same period in 1995; and (iii) that the combined Bristol and CRI entity lost money for the nine months ended September 30, 1996. The Complaint further alleges "control person" liability under section 15 of the Securities Act and section 20(a) of the Exchange Act against the Individual Defendants. Plaintiffs seek damages, interest, and fees.

On November 19, 1997, the Court granted Plaintiffs' motion to be appointed lead plaintiffs and for their counsel to be appointed lead plaintiffs' counsel.

The Bristol Defendants and Duke filed motions to dismiss on December 23, 1997.

---

1. The Complaint does not indicate whether "results" refers to revenue, profit, or some other financial measurement.

First Cambridge filed their motion to dismiss on January 15, 1998. The motions were deemed fully submitted on February 25, 1998 without oral argument.

### The Facts

On a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., the facts of the complaint are presumed to be true, and all factual inferences are drawn in the plaintiff's favor. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Therefore, the factual allegations set forth below do not constitute findings of fact by the Court. Unless otherwise indicated, the facts are drawn from the allegations made by the Plaintiffs in the Complaint.

Bristol was formed on April 3, 1996, to establish a national network of full service dealers of retail automation equipment, such as point-of-sale systems, electronic cash registers, and related hardware and software. On June 28, 1996, Bristol acquired CRI, a point-of-sale systems dealership founded in 1974 doing business in Kentucky and Ohio.

The Bristol registration became effective on November 12, 1996, and the securities were first sold to the public beginning November 13, 1996. In total, Bristol issued 1,250,000 shares of Stock for $6.00 per share and 625,000 Warrants at $0.125 per warrant in the IPO. The Stock and Warrants are publicly traded on the Nasdaq Small Cap Market.

Plaintiffs contend Bristol's registration statement and prospectus did not disclose losses Bristol incurred for the two quarters ending June 30, 1996, and September 30, 1996. Plaintiffs allege that the true financial condition of Bristol was not revealed to the investing public until May 2, 1997, when Bristol announced it had suffered a loss of $433,000 in the first quarter of 1997. On that day Bristol stock, which sold for $6.00 per share at the initial public offering, closed at $3 1/16 per share.

The only information in the prospectus concerning net income before taxes for any part of 1996 was the net income before taxes for CRI for the fiscal year ended June 30, 1996. No quarterly information was provided for CRI, and there were no financial statements for Bristol or for Bristol and CRI on a consolidated basis.

Plaintiffs contend that these financial statements failed to disclose Bristol's losses, which were approximately $31,000 as of June 30, 1996, and $83,000 as of September 30, 1996. Combined, Bristol and CRI had lost $23,632 by the end of the third quarter, ending September 30, 1996. Nor was there any indication that the fourth quarter, which was half-completed at the time of the IPO, would result in an additional $116,152 in losses.

The Defendants contend that the prospectus did contain information related to Bristol's limited operating history and business plan, the operational and financial history of CRI, and the risks associated with the securities that Bristol was offering. Information was provided that revealed Bristol's sole expenses through June 30, 1996, prior to acquiring CRI, was $31,250 in salaries.

With respect to CRI, the Defendants contend that the prospectus offered detailed financial information for fiscal years ending June 30, 1994, 1995, and 1996, which revealed that CRI's performance decreased significantly between 1995 and 1996.[2] Defendants contend that because of Bristol and CRI's brief joint operating experience, the prospectus did not include a combined income statement but instead contained *pro forma* consolidated information, as if CRI had been acquired by Bristol on July 1, 1995. This *pro forma* statement revealed that Bristol would have suffered a first quarter loss before taxes for the period of $20,479. Furthermore, while the third quarter information was not disclosed in the November prospectus, it was disclosed in December when Bristol filed it's third quarter 1996 10–Q with the Securities Exchange Commission (the "SEC").[3]

---

**2.** CRI's income before taxes dropped over 29 percent, from $172,794 in fiscal year 1995 to $121,948 in fiscal year 1996. CRI's gross margin decreased from 38 percent in 1995 to 32 percent in 1996. CRI generated nearly 22 percent less cash in 1996, dropping from $189,00 in 1995 to $148,000 in 1996.

**3.** The 10–Q stated, among other things, that Bristol's pre-tax income for the period of July

Bristol further contends that on March 14, 1997, it filed with the SEC it's 1996 annual 10–K which covered the period from Bristol's inception through the end of the fiscal year, disclosing further significant losses. At the end of the 1997 first quarter losses amounted to $433,936, which was disclosed May 2, 1997, in Bristol's 10–Q SEC filing.

## Discussion

### I. *Standard For Motion To Dismiss*

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is clear that plaintiff can prove no set of facts in support of his or her claim which would warrant relief, the motion to dismiss must be granted. *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989) (on motion under Rule 12(b)(6), Fed.R.Civ.P., affirmation of dismissal of the complaint requires it to be " 'clear that no relief could be granted under any set of facts that could be proved consistent with the allegations' ") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

### II. *Plaintiffs Do Not Lack Standing To Assert The Section 11 Securities Act Claim*

■ The first issue is whether Plaintiffs have standing to assert a claim for issuing a false and misleading prospectus under § 11 of the Securities Act. The Defendants contend that only plaintiffs who buy shares from issuers in the IPO can assert a claim, and that none of the Plaintiff's in this action bought in the IPO. Section 11 provides that:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *any person acquiring such security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may ... sue [five categories of defendants named therein].

*See* 15 U.S.C. § 77k(a) (1994) (emphasis added).

It has been the law in this Circuit for over thirty years that a plaintiff who can trace their securities to a registered offering has standing to sue under of the Securities Act for a defect in that registration. In *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967) (Friendly, J.), the Second Circuit addressed the issue of whether a class action settlement agreement in a case alleging § 11 liability could limit benefits only to persons who could establish that they purchased securities issued under the allegedly defective registration statement, or whether all holders of the issuer's securities purchased after the issuance of the allegedly incomplete prospectus, but who could not so trace their purchases, were entitled to recover. *Id.* at 271. Focusing on the statutory phrase "any person acquiring such security," the court held that the statutory scheme and legislative history indicated that the term "such security" referred to the more narrow class of potential plaintiffs who could "trace" their securities to the challenged registration.

The court reasoned that the incentives for full and accurate disclosure through registration were directed at protecting purchasers of the newly issued shares, rather than the shares already outstanding. Moreover, the limitation of liability contained in sections 11(g) and 11(e), which, among other things, limit liability to price at which the security was offered to the public, indicated that recovery by those purchasing the new shares

through September 1996 was $14,566, an 83 percent drop from the $87,860 pre-tax income for CRI in the same period of 1995. Bristol suffered a pre-tax loss for the period from it's inception on April 3, 1996 through September

30, 1996 of $16,684. CRI suffered a pre-tax loss of $6,948 for the six months ended June 30, 1996. Bristol suffered a *pro forma* loss of $82,-974 for the nine months ended September 30, 1996.

would be unreasonably diluted if holders of all outstanding shares could recover. *Id.* at 272.

Finally, the court reviewed the legislative history of the Security Act's civil remedies. The House Report stated that § 11 remedies were accorded to purchasers "regardless of whether they bought their securities at the time of the original offer or at some later date," H.R.Rep. No. 85, 73rd Cong. 1st Sess. 5 (1933) (hereinafter the *House Report*). The *Barnes* court reasoned that this extended liability to "open market purchasers of the registered shares." *Id.* at 273.

Until recently, courts in this Circuit have consistently applied the *Barnes* tracing requirement to narrow the class of potential plaintiffs. For example, in *Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y.1972), the court certified a plaintiff class consisting of those who purchased securities from the time the registration was effective until approximately six months thereafter, whether or not the securities were purchased on the open market, as long as the plaintiff "purchased [the issuer's] securities that are the direct subject of the registration statement and prospectus." *Id.* at 592–93. *See also In re AES Corp. Sec. Litig.*, 825 F.Supp. 578, 592 (S.D.N.Y.1993) (claims under § 11 may be brought by persons who purchased shares "traceable" to the public offering); *Unicorn Field, Inc. v. Cannon Group, Inc.*, 60 F.R.D. 217, 226 (S.D.N.Y.1973) ("It is now well settled in this Circuit that § 11 of the Securities Act permits recovery only by purchasers of the shares covered by the defective registration statement or by those who can trace their purchases directly to such shares."); IX Louis Loss and Joel Seligman, Securities Regulation 4249 (3rd ed. 1992) ("Suit may be brought by any person who acquired a *registered* security, whether in the process of distribution or in the open market.").

However, in *In Re WRT Energy Sec. Litig.*, Nos. 96 Civ. 3610, 96 Civ. 3611, 1997 WL 576023 (S.D.N.Y. Sept. 15, 1997), the court further narrowed the class of potential § 11 plaintiffs to those who purchased their securities in the initial public offering, thereby excluding those who could trace their securities to the registration statement but which

were purchased on the open market. The court concluded that the Supreme Court's decision in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) compelled this result. Other courts considering this issue have split on the issue of what impact, if any, *Gustafson* has on the "tracing" issue. *Compare Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 556–57 (D.Colo.1998) ("[N]otwithstanding *Gustafson,* [ ] section 11 extends not only to persons who buy 'in the Offering,' but to all persons who acquired stock traceable to a public offering conducted *via* a misleading registration statement") with *Gould v. Harris,* 929 F.Supp. 353, 359 (C.D.Cal.1996) (tracing no longer sufficient since "[u]nder Gustafson, sections 11 and 12(2) apply only to purchases made in the initial offering and not those purchased in the secondary market"); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 575 (D.N.J.1996) (same); *Murphy v. Hollywood Entertainment Corp.*, No. 95–1926–MA, 1996 WL 393662, *3 (D.Or. May 9, 1996) (same); *Stack v. Lobo,* 903 F.Supp. 1361, 1375–76 (N.D.Cal.1995) (same).

The facts in *Gustafson,* however, neither involved a section § 11 claim nor a public offering. The issue before the Court in *Gustafson* was whether a private agreement to sell securities constituted a "prospectus" for purposes of § 12(2). *Gustafson,* 513 U.S. at 568, 115 S.Ct. at 1066. That section provides that any person who:

> offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(2).

The Court concluded that § 12(2) liability is limited to securities transactions where a

prospectus, as defined by section 10 of the Securities Act, is required. Therefore, the Court reasoned, "Section 12(2) does not extend to a private sale contract, since a contract, and its recitations, that are not held out to the public are not a 'prospectus' as the term is used in the 1933 Act." *Gustafson,* 513 U.S. at 561, 115 S.Ct. at 1062–63.

Rather than relying on the precise holding in *Gustafson,* the Defendants base their contention that the narrower definition of potential plaintiffs is correct on dicta in the two dissenting opinions, the legislative history recited, and their view of the *Gustafson* Court's interpretation of the statutory scheme of the Securities Act.

Defendants cite a sentence in a footnote of Justice Ginsberg's dissent to support their position. Justice Ginsberg wrote that "there is no dispute that ... [section 11] appl[ies] only to public offerings—or to be more precise, to transactions subject to registration." *Id.* at 600 n. 4, 115 S.Ct. at 1081 n. 4. (Ginsberg J. dissenting). In context, this statement is intended to support Ginsberg's view that § 12(2), in contrast with § 11, is not limited to public offerings, but rather includes within its sweep the private securities transaction at issue. Here, however, there is no dispute either about whether § 11 is limited to public offerings: The securities here were sold subject to a registration in a public offering. Defendants suggest that the securities must be purchased *in* the public offering.[4] Justice Ginsberg's statement, however, does not go that far.

Defendants also cite Justice Thomas' dissent, in which he wrote that Congress did not limit § 12(2) to issuers "as it chose to do with the provisions that are limited to initial distributions," citing § 11. *Id.* at 590, 115 S.Ct. at 1076 (Thomas, J. dissenting). In his textual analysis of § 12(2), Justice Thomas contends that § 11's text limiting liability to "every person who was a director of ... or partner in the issuer" at the time of filing indicates that its scope is limited to initial public offerings, whereas the absence of such language in § 12(2) is persuasive that private transactions not involving an issuer are in-

cluded. There is no dispute here, however, that § 11 liability extends beyond its specifically enumerated potential defendants, or that liability is limited to public offerings. Therefore, as with Justice Ginsberg's proposition, this statement is consistent with retention of the tracing requirement for standing to sue under § 11.

Defendants also rely on legislative history recited in *Gustafson* to narrow § 11's sweep. According to the House Report, "the [Securities Act] affects only new offerings of securities .... It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering." House Report at 5. This is the same House Report, however, which stated that § 11 remedies are available "regardless of whether [plaintiffs] bought their securities at the time of the original offer or at some later date," *id.* It was this later statement upon which the *Barnes* court concluded that liability extends to "open market purchasers of the registered shares." *Barnes,* 373 F.2d at 273. Therefore, the litigation history is at best ambiguous about whether purchasers in the aftermarket who can trace their securities back to the defective registration statement have standing.

Finally, the statutory text supports the position that standing to sue is not limited to purchases in the public offering, but is open to purchases in the secondary market. Initially, the language of § 11 is broad: " [A]ny person acquiring such security ... may ... sue." Furthermore, § 11(a) states that if a "person acquired the security after the issuer has made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement," then the right of recovery is conditioned upon proof that the person actually relied on the false statement in the registration statement. Congress therefore explicitly contemplated that a plaintiff could purchase a registered security well after the IPO and still have a remedy under § 11.

---

4. Defendants do not specify what purchasing "in" a public offering would mean (*e.g.,* directly from an issuer, an underwriter, within a certain period, as part of the initial distribution).

Section 11(e) further supports this interpretation of the statute. It provides that the plaintiff may recover:

> such damages as shall represent the difference between *the amount paid for the security (not exceeding the price at which the security was offered to the public* ) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought....

(emphasis added). If Congress intended to limit liability to purchasers in the IPO, the language could simply read "at the offering price." Instead, the language permits recovery for purchases at other than the offering price, as long as the liability is so limited.[5]

To limit liability only to buyers in the IPO and not to buyers who can trace their shares to the registration statement allows the issuers to escape a margin of liability for which § 11 was drafted to cover. Defendant's argument that Plaintiffs lack standing fails in light of the statutory text and legislative history.

### III. *Plaintiffs Have Adequately Plead An Actionable Omission*

### A. *Plaintiffs Have Pleaded An Actionable Omission for the Section 11 Claim*

▋ Under § 11(a) of the Securities Act an omission from a registration statement is actionable if, among other things, it was "required to be stated therein." 15 U.S.C. § 77k(a). Plaintiffs contend that Bristol's failure to disclose updated financial statements as of a date within 135 days of the effective date of the offering violates the disclosure required by Item 310(g) of Regulation S–B. Regulation S–B addresses the financial disclosures that must be contained in a prospectus that is filed under Form SB–1 for small businesses such as Bristol. Item 310(g) provides:

> If required financial statements are as of a date 135 days or more prior to the date a registration statement becomes effective or proxy material is expected to be mailed, the financial statements shall be updated to include financial statements for an interim period ending within 135 days of the effective or expected mailing date.

17 C.F.R. § 228.310(g). Among the required financial statements are the interim financial statements required by Item 310(b), which "shall include a balance sheet as of the end of the issuer's most recent fiscal quarter and income statements and statements of cash flows for the interim period up to the date of such balance sheet and the comparable period of the preceding fiscal year." 17 C.F.R. § 228.310(b). Thus Bristol was required to file a quarterly income statement with its registration, and if such statement was for a period 135 days or more before the effective date, it was required to have been updated.

The Bristol registration became effective on November 12, 1996. The most recent quarterly report included in the filing was as of June 30, 1996, which is 135 days before the effective date. Accordingly, the required financial statements were "as of a date 135 days" prior to the date the registration statement became effective, and therefore Bristol's failure to update the financial statement "for an interim period ending within 135 days of the effective" date violated the required disclosure.

Defendants rely on Rule 417 for the proposition that since November 11, 1996, was a holiday (Veteran's Day), the effective date of

---

**5.** Defendants contend that § 11(e) refers to the issuers' right to conduct shelf offerings pursuant to Rule 415 of the Securities Act. *See* 17 C.F.R. § 230.415. Rule 415 permits issuers to file a registration statement "for an offering to be made on a continuous or delayed basis in the future." *Id.* However, Rule 415 was promulgat- ed by the SEC in 1982, almost fifty years after the Securities Act was passed in 1933. *See* 47 Fed.Reg. 11380, 11438 (1982) (promulgating temporary shelf registration rule). Thus, it does not help to determine the legislative intent of the 1933 Congress.

November 12, 1996, should be considered "as of" November 11, which would come within the 135 day requirement. Rule 417 provides:

Whenever financial statements of any person are required to be furnished as of a date within a specified period prior to *the date of filing* the registration statement and the last day of such period falls on a Saturday, Sunday or holiday, such registration statement may be filed on the first business day following the last day of the specified period.

17 C.F.R. § 230.417 (emphasis added). By its terms, however, this rule applies to registration statement *filing* date, not *effective* dates. Item 310(g), in contrast, governs the currency of information with respect to the effective date. Therefore, Rule 417 has no application here.

Accordingly, Defendants' motion to dismiss the § 11 claim for failure to allege an actionable omission is denied.

### B. *Plaintiffs Have Pleaded An Actionable Omission for the Section 10(b)–5 Claim*

■ Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as necessary or appropriate . . . for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under § 10(b), makes it unlawful, among other things, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim under Rule 10b–5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on

defendant's action cause him injury." *Bloor v. Carro*, 754 F.2d 57, 61 (2d Cir.1985).

■ Plaintiffs allege that Defendants omitted interim financial statements required pursuant to Item 310(g). When a 10(b) claim "is based upon non-disclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 234, 100 S.Ct. 1108, 1117–18, 63 L.Ed.2d 348 (1980). Here, the disclosure required by the Securities Act created a duty upon which an actionable omission may be alleged for § 10(b) purposes. Accordingly, Defendants' motion to dismiss the Section 10(b) claim for failure to allege an actionable omission is denied.

### IV. *The Plaintiffs Have Adequately Pleaded Loss Causation*

#### A. *The Plaintiffs Have Adequately Pleaded Loss Causation for the 10b–5 Claim*

■ The Defendants contend that the Complaint should be dismissed because Plaintiffs have not properly alleged a causal connection between the alleged omissions and their financial losses. Under § 10(b) of the Exchange Act Plaintiffs must allege in their complaint that (1) they were induced by the misrepresentation or omission to take part in the transaction; (2) but for the misrepresentation, they would not have suffered a financial loss; and (3) the loss they suffered was a foreseeable consequence of the misrepresentation or omission. *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992) (under section 10(b) in order to show loss causation a plaintiff must show "that the economic harm that it suffered occurred as a result of the alleged misrepresentations").

■ Defendants do not dispute that Plaintiffs sufficiently alleged facts to show loss causation in the Complaint, but rather advance factual arguments to refute the allegations.[6] Defendants, however, mistakenly rely on cases decided at the summary judgment phase. *See, e.g., Akerman v. Oryx*

---

**6.** Defendants contend that after disclosure of the third and fourth quarter results of 1996 were made public, the stock price remained stable for four months. Defendants also point to the fact that after the total loss of $433,936 was disclosed

to the public on May 3, 1997, Bristol's stock price first plummeted but then rose back to it's previous levels within six days and remained stable for one week.

*Communications, Inc.*, 810 F.2d 336, 337–38 (2d Cir.1987) (review of summary judgment). In a motion to dismiss, the Court must accept plaintiffs allegations as true. Accordingly, the evidence advanced by Defendants is not within the four corners of the Complaint, and cannot be considered here. *See Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988) ("Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R.Civ.P. 56 and afford all parties the opportunity to present supporting material.").

Defendants cite *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir.1995) for the proposition that the Court should take judicial notice of the stock price trends after certain disclosures by Bristol to decide that the failure to disclose the poor business results in the November prospectus did not cause any loss to Plaintiffs. In *Hirsch*, however, the court took judicial notice that certain parties pled guilty to felonies, *id.* at 1095, which is significantly different matter.

Moreover, "[t]he presence or absence of price movement immediately after disclosure is not per se dispositive under section 11(e)." *See Adair v. Kaye Kotts Assoc.*, No. 97 Civ. 3375 at 13, 1998 WL 142353 (S.D.N.Y. March 27, 1998) (Sotomayor, J.). In *Kaye Kotts*, the defendants urged the court, on summary judgment, to find that an increase in stock price after disclosure of the allegedly material omitted information in a registration statement amounted to a valid defense under § 11(e). The court noted that price movement is not dispositive, particularly where, as here, it is undisputed that the stock price did in fact decline at some point after the disclosure of the company's financial results. The court concluded that "[b]ecause no expert analysis of the price issue has been provided, the Court cannot discern from the evidence what part, if any, [of the information] might have had on the stock price." *Id.* at 14. Since the bare assertion of stock price movement is not appropriate for summary judg-

ment purposes, *a priori*, it is inappropriate here on a 12(b)(6) motion.

Accordingly, Defendants' motion to dismiss the section 10(b) claim for lack of loss causation is denied.

### B. *The Affirmative Defense Of Lack Of Loss Causation Cannot Be Asserted On This Motion To Dismiss*

Although Defendants acknowledge that loss causation is not a required element of a § 11 claim, they contend that it is an affirmative defense which can be asserted here. Section 11(e) of the Securities Act provides that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the misstatement or omission] such portion of or all such damages shall not be recoverable." *See* 15 U.S.C. § 77k(e). Because, as with the § 10(b) claim, Defendants rely on facts outside of the Complaint, this issue cannot be decided upon the instant motion to dismiss. *See Castro v. United States*, 34 F.3d 106, 111 (1994) (affirmative defense not proper on 12(b)(6) motion where not necessary for plaintiff to plead elements of affirmative defense to state a claim upon which relief can be granted).

### V. *Plaintiffs Have Adequately Alleged Scienter*

Defendants contend that the Complaint fails to allege scienter with particularity, and therefore the 10(b) claim must be dismissed. Under section 10(b) of the Exchange Act, plaintiffs must allege that defendants acted either intentionally or with such recklessness as to "approximate an actual intent to aid in the fraud being perpetrated." *Chill v. General Elec. Co.*, 101 F.3d 263, 268–69 (2d Cir.1996). To establish scienter, a plaintiff must "either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir.1996).

In 1995, Congress passed the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Exchange Act § 21D(b)(2), 15 U.S.C. § 78u–4(b)(2).

Recently, however, three judges in the Southern District have concluded that the PSLRA altered the Second Circuit law on pleading scienter. *See Norwood Venture Corp. v. Converse, Inc.,* 959 F.Supp. 205, 208–09 (S.D.N.Y.1997) (Baer, J.) (Congress intended to strengthen existing pleading requirements, so motive and opportunity, without more, no longer suffices to raise a strong inference of scienter); *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 242 (S.D.N.Y.1997) (Rakoff, J.) (statutory language "makes no mention whatever of 'motive and opportunity,' nor singles out any other special kind of particulars as presumptively sufficient"); *Novak v. Kasaks,* 997 F.Supp. 425, 435 (S.D.N.Y.1998) (Schwartz, J.) (evidence of motive and opportunity no longer suffices to plead scienter).

■ Even under the higher standard, Plaintiffs have adequately plead scienter. Plaintiffs allege that Defendants violated the Securities Act by failing to disclose updated financial statements as required by Item 310(g) of Regulation S–B. Disclosing the third quarter results would have, according to Plaintiffs, shown increasing losses for the combined companies. The alleged rule violation, combined with the allegation that the missing information would have negatively impacted the offering price, alleges facts with sufficient particularity to show a strong inference of an intention to make misrepresentations. Therefore, Defendants' motion to dismiss the 10(b) claim for failure to plead scienter adequately is denied.

*Conclusion*

For the reasons set forth above, Defendants' motion to dismiss is denied.

It is so ordered.