**In re N2K INC. SECURITIES LITIGATION.**

No. 98 Civ. 3304(HB).

United States District Court, S.D. New York.

Jan. 31, 2000.

---

Catherine A. Murphy, Jonathan M. Plasse, Goodkind, Labaton, Rudoff & Sucharow, L.L.P., New York, NY, Mark C. Gardy, Abbey, Gardy & Squitieri, L.L.P., New York, NY, for Kenneth Bender, Plaintiff.

Richard W. Reinthaler, Saul P. Morgenstern, John J. Blood, Dewey Ballantine LLP, New York, NY, for Defendants.

### AMENDED MEMORANDUM & ORDER

BAER, District Judge.

The plaintiffs bring this class action lawsuit against defendant corporation N2K, Inc. ("N2K") and six named officers of N2K for alleged violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o, in connection with the plaintiffs' purchase of common stock sold by N2K in a public offering on April 15, 1998.[1] The defendants move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the consolidated amended class action complaint. For the reasons discussed below, the defendants' motion is GRANTED.

### I. BACKGROUND

The well-pleaded facts of this case, taken as true on this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), are as follows:

N2K is a Delaware corporation with principal executive offices in New York

---

1. The amended complaint is inconsistent with respect to the specific date this offering was actually completed. Paragraphs 1 and 43 indicate that the offering was completed "[o]n or about April 15, 1998," while paragraph 6 suggests the offering was completed on April 14, 1998. (*See* Compl. ¶¶ 1, 6, 43.) For purposes of clarity, and since the actual date is not at issue in this litigation, the Court will assume the offering was completed on April 15, 1998.

City and is an on-line music retailer that uses the internet for promoting, marketing and selling music and merchandise via its website, known as "Music Boulevard." Defendant Laurence Rosen ("Rosen") is the chief executive officer of N2K and Chairman of its Board of Directors. Defendants Jonathan Diamond ("Diamond") and Robert Grusin ("Grusin") are both vice chairmen and directors of N2K. Defendant James Coane ("Coane") is president, chief operating officer, and a director of N2K. Defendant Bruce Johnson ("Johnson") is chief financial officer, secretary, treasurer, senior vice president, and a director of N2K. Defendants Robert Harris ("Harris") and Susanne Harrison ("Harrison") are directors of N2K. All individual defendants were directors and/or senior executive officers of N2K, and were signatories to the registration statement disseminated in connection with the public offering at issue here.

The plaintiffs and other class members are purchasers of N2K common stock sold in connection with the April 15, 1998 offering.

On August 7, 1997, N2K filed a registration statement with the SEC for an initial public offering (the "IPO") of 3,330,221 shares of common stock at $19.00 per share. The IPO was completed on October 17, 1997. By March 1998, N2K sought to raise additional capital through a secondary offering (the "offering") of its common stock. On March 4, 1998, N2K filed a registration statement and preliminary prospectus with the SEC for the sale of just over 3.1 million shares of common stock. Included with these documents were N2K's annual financials for the years 1994 through 1997, and quarterly results for the periods between March 31, 1996 and December 31, 1997. The registration

statement was later declared effective on April 14, 1998. It did not include N2K's first quarter results for the quarter ending March 31, 1998, a key factor in this litigation.

On April 15, 1998, pursuant to the registration statement and prospectus, N2K completed the offering of 3,125,722 shares of common stock at $33.00 per share. The company received gross revenues from this secondary offering of approximately $60 million, roughly $16 million more than was anticipated at the time the registration statement was filed.[2]

N2K announced on April 23, 1998 its results for the quarter ending March 31, 1998, this announcement coming twenty-three days after the quarter ended and nine days after the effective date of the registration statement. The company reported revenues of $7,031,000 and a net loss of $13,704,000, a loss of $1.13 per share, nine cents more per share than analysts' expectations. By the end of trading on April 24, 1998, the price for N2K's shares had fallen nearly $8 per share to close at $25 1/4. As of the date of the complaint, the price of N2K's common stock had not recovered and had, in fact, slipped to $13 13/16 per share.

The plaintiffs maintain that at the time the registration statement became effective on April 14, 1998, the defendants possessed undisclosed information regarding N2K's revenues, expenses, and losses for the first quarter of 1998. The defendants deny any such knowledge and rely in part on the fact that said financials were released when they became available on April 23, 1998. The amended complaint alleges that the defendants' possession of this information[3] is evidenced by N2K's

---

**2.** At the time the registration statement was filed with the SEC, N2K anticipated proceeds of approximately $47.2 million from the offering. This figure was based on an assumed offering price of $25.38 per share, the price per share at the time of the filing. By March 20, 1998, however, the price of N2K's shares

had risen to $28 1/4, and by April 14, 1998, the stock had climbed to $34 5/8.

**3.** At oral argument on this motion, I directed the parties to conduct a limited number of depositions and thereafter submit supplemental briefs on the issue of whether or not the defendants actually knew—based on the fi-

having "release[d] accurate financial results for the fourth quarter and year ended December 31, 1997 . . . just twelve days after the close of those reporting periods."[4] (Compl.¶ 49.) The defendants therefore knew, the argument continues, at the time the registration statement became effective that N2K's first quarter numbers failed to meet analysts' expectations which, when disclosed to investors, would likely cause a significant decline in the price of N2K shares. According to the plaintiffs, since the price of N2K's stock was likely to be "materially adversely affected" upon public disclosure, the defendants—hoping to maximize the revenue received from the offering—concealed the first quarter information by not including it in the registration statement and prospectus.

The plaintiffs commenced this suit on May 8, 1998, and filed their consolidated amended class action complaint on August 4, 1998. The first cause of action is brought against all defendants, pursuant to Section 11 of the Securities Act ("Section 11"), 15 U.S.C. § 77k, based upon the omitted financial data. The second cause of action is brought against the individual defendants, pursuant to Section 15 of the Securities Act ("Section 15"), 15 U.S.C. § 77o, which imposes derivative liability upon "controlling persons" for violations of Section 11 by N2K.

## II. DISCUSSION

### A. Standards for Motion to Dismiss

Dismissal of a complaint pursuant to Rule 12(b)(6) is permitted "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Scotto v. Almenas*, 143 F.3d 105, 109–10 (2d Cir.1998). "The task of the court in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)). In deciding a 12(b)(6) motion, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Thomas v. City of New York*,

---

nancial data available to them at the time of the offering—that the greater-than-expected losses were on the immediate horizon. Because I have since found this issue is not determinative, and notwithstanding the defendants' position as discussed in their supplemental brief and in footnote 4 herein, I will accept as true the plaintiffs' allegations in paragraphs 48 through 51 of the complaint that the defendants were actually aware of the first quarter losses at the time of the offering. *See Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180 (S.D.N.Y.1996) ("On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences must be made in the plaintiff's favor.")

4. On January 12, 1998, N2K had issued a press release to announce its expected revenues for the fourth quarter and for the calendar year 1997, both periods having ended on December 31, 1997. N2K reported that it expected revenues of $4.7 million and $11.2 million for the fourth quarter and calendar year, respectively. The relative accuracy of this information was confirmed on February 18, 1998 when N2K reported actual revenues of $4,756,000 and $11,263,000 for the respective time periods. The plaintiffs submit that N2K's ability to issue accurate quarterly results less than two weeks after the close of the quarter and year "reflects the unique position of an Internet retailer whose sales are processed electronically through a centralized website" thus "permitting almost instant access to revenue and sales-related expense information." (Compl.¶ 36.) The defendants dispute this characterization since only N2K's *revenues* were known and disclosed on this expedited basis. They argue that sales-related and other expenses necessary to compute its operating loss are not processed through its centralized website and thus are not immediately known. According to the defendants, these latter figures were not released until February 18, 1998—approximately six weeks after the end of the quarter—which defeats the inference suggested by the plaintiffs that the company knew on April 14, 1998 its operating losses for the quarter ending March 31, 1998.

143 F.3d 31, 36 (2d Cir.1998). On a motion to dismiss a complaint brought under the securities laws, the Court may properly consider documents, such as the prospectus at issue, which are incorporated into the complaint by reference. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

## B. *Elements of Section 11*

Section 11 of the Securities Act of 1933 creates a private remedy for any purchaser of a registered security if any part of the registration statement,

> when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . .

15 U.S.C. 77k(a). Thus, a material omission from a registration statement is actionable if the omitted facts (1) were required by SEC regulations to be stated therein, or (2) were necessary to make the disclosures in the registration statement not misleading.

### 1. *SEC Regulations*

The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus. Article 3 of Regulation S–K, entitled "Supplementary financial information" requires disclosure of, *inter alia,* net sales, gross profit, and net income or loss "for each full quarter within the two most recent fiscal years and any subsequent interim period for which financial statements are included or are required to be included by Article 3 of Regulation S–X [17 CFR 210]." 17 C.F.R. § 229.302(a)(1). It is undisputed that the defendants provided the requisite information for each full quarter from March 31, 1996 through December 31, 1997. The

sticky wicket here is whether Article 3 of Regulation S–X required N2K's financial information ("interim financial information") for the interim period of January 1, 1998 through March 31, 1998 (the "interim period"). The defendant argues that it did not, and I agree.

Article 3 of Regulation S–X requires the inclusion of interim financial information where the financial information in a registration statement is old or "as of a date 135 days or more prior to the date the [registration statement] is expected to become effective." 17 C.F.R. § 210.3–12(a). N2K's registration statement was declared effective on April 14, 1998; thus, only if the financial statements therein were "as of" November 28, 1997 or earlier—135 days or more prior to April 14, 1998— would the disclosure of the company's first quarter results be required under this rule. Unfortunately for the plaintiffs, the financial statements in N2K's registration statement were "as of" December 31, 1997 and therefore well within the 135–day window.

■ The plaintiffs contend that, in addition to the information expressly required by these regulations, the defendants were required under SEC Rule 12b–20 to include the 1998 first quarter financial data as information "necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. § 240.12b–20.[5] As the defendants correctly point out, however, Rule 12b–20 is inapplicable since it was promulgated under the Securities and Exchange Act of 1934, a different statute than the one at issue in the instant case. Although not cited by either party, the SEC has promulgated a regulation under the Securities Act of 1933 that is identical to its 12b–20 counterpart. *See* 17 C.F.R.

---

**5.** The regulation reads in full:
> In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be nec-

> essary to make the required statements, in light of the circumstances under which they are made not misleading.
>
> 17 C.F.R. § 240.12b–20.

§ 230.408. While applicable, it is to no avail since here the statements were not misleading.

■ The plaintiffs also rely on case law to support its position that the defendant was required to disclose the interim financial information. Plaintiffs cite *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir.1996), which held that an issuer in possession of nonpublic information was required in connection with a public offering to disclose known adverse facts about a quarter that had not yet ended. The duty to disclose arose in *Shaw* because the nonpublic information at issue represented "an *extreme departure* from the *range of results* which could be anticipated *based on currently available information* ...."[6] *Id.* at 1210 (emphasis added). Here the defendants' actual losses for the interim period in question were not beyond the range of plausible results based on available information at the time of the offering. Although the defendants had announced sizeable increases in revenues for the quarter and calendar year ending December 31, 1997, those figures were undoubtedly tempered, if not overshadowed, by N2K's net losses over those same periods. While net revenues increased from $1,115,000 to $4,755,000 between the first and fourth quarters of 1997, the material submitted to the SEC show net losses jumped from $4,518,000 to $13,196,342 during the same time period. Perhaps even more telling is that between the third and fourth quarters of 1997, N2K's net revenues increased by approximately 33 percent, while net losses jumped by nearly 250 percent.[7] Given these obvious trends, along with the many pages of explicit warnings and risk factors contained in N2K's prospectus, the information N2K possessed about its first quarter 1998 financial data—that its net loss had increased from $13,196,000 to $13,704,000—cannot reasonably be characterized as an "extreme departure" from the range of anticipated results so as to make actionable N2K's omission of this nonpublic data from its registration statement.[8]

6. The "extreme departure" in *Shaw* was an operating loss of $72 million for the quarter ending January 1, 1994 that jumped to over $183 million for the quarter that ended on April 2, 1994. *Id.* at 1200. The First Circuit observed that the second quarter loss was "the largest that the company had reported since the first quarter of fiscal 1993" and that the loss "bucked the positive trend of reduced losses under the company's new management." *Id.*

7. N2K's net revenues were $3,569,000 for the quarter ending September 30, 1997 and $4,755,000 for the quarter ending on December 31, 1997. The net losses during these same quarters were $5,374,000 and $13,196,000 respectively. (Reinthaler Aff. Ex. 1 ("Prospectus") at 25.)

8. Other cases cited the plaintiff are neither binding nor persuasive. In *Baffa v. Donaldson, Lufkin & Jenrette Securities Corporation*, 999 F.Supp. 725 (S.D.N.Y.1998), the court simply addressed whether the complaint there had satisfied the pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Moreover, the opinion merely states "defendants had information regarding large financial losses at the time the Offering by [the defendant company] became effective" and that they failed to disclose such information. *Id.* at 728. The court there failed to so much as mention the question of required disclosure of interim information, and it is unclear whether or not this particular issue was even raised. The plaintiffs' remaining cases on this score are inapposite. The defendants in *In re Proxima Corporation Securities Litigation*, 1994 WL 374306, at *3 (S.D.Cal. May 3, 1994), failed to include in its prospectus facts then-known that indicated the company was in a "period of severe adversity." However, this omission rendered the prospectus misleading since the otherwise accurate "historical facts" disclosed therein reflected past profits and figures that indicated past and future successes for the company. That is hardly the case here. Finally, the Ninth Circuit in *In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir.1994), addressed in the context of a motion for summary judgment the defendant underwriters' due diligence in investigating the offering company's business and the facts underlying its prospectus. Moreover, the offering company's conduct there involved deliberately falsified financial statements, fabricated consignment sales, and lies made to the SEC in response to Commission inquiries. *Id.* at 620.

In light of the foregoing, disclosure of the interim financial information for the quarter ending March 31, 1998 was not explicitly required under Section 11 and the regulations promulgated thereunder.

## 2. Information Otherwise Necessary to Make the Registration Statement Not Misleading

■ The plaintiffs submit that N2K's failure to disclose its first quarter results of 1998 until after the offering rendered the registration statement and prospectus misleading. More specifically, the defendants' alleged knowledge at the time of the offering of its net losses for the first three months of 1998 made the following disclosure—contained in the prospectus under the section entitled, "Potential Fluctuation In Quarterly Results"—false and misleading:

Due to all the foregoing factors, it is possible that in some future quarter or quarters the Company's operating results will be below the expectations of securities analysts and investors. In such event, the price of the Common Stock would likely be materially adversely affected.

(Prospectus at 12—13.) The plaintiff argues that this statement is misleading in that N2K's financial results *were* below analysts' expectations, and that the defendants knew this fact at the time the registration statement became effective. I disagree.

■ In examining claims under Section 11, the prospectus at issue must be read "as a whole." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1264, 117 S.Ct. 2433, 138 L.Ed.2d 194 (1997). Additionally, the central inquiry to determine whether a prospectus is materially misleading is "whether the defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]" *Id; see also I. Meyer Pincus & Associates,*

*P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir.1991).

It can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled about the nature of N2K's securities. N2K's prospectus is replete with warnings and explanations of risks associated with the company's past financial history and future expectations. The third paragraph on the cover of the prospectus states in large, bold print, "These securities involve a high degree of risk." On page 5, the prospectus warns potential investors to consider the many risk factors discussed within the document, including "historical and *anticipated* losses." (Prospectus at 5 (emphasis added).) A few pages later in the document, this warning is discussed in full:

The Company has incurred significant losses and *expects to continue to incur significant losses on a quarterly and annual basis for the foreseeable future* ... The Company currently intends to *increase substantially its operating expenses* as a result of the Company's strategic alliances, to fund increased sales and marketing, to enhance existing websites and to implement strategic relationships important to the success of the Company. To the extent that such expenses precede or are not subsequently followed by increased revenues, the Company's business, results of operations and financial condition will be materially adversely affected. *The Company expects negative cash flow from operations to continue for the foreseeable future as it continues to develop and market its business.*

(*Id.* at 8 (emphasis added.)) Thus, the prospectus not only warns prospective investors of possible losses in the future, but flatly states that the company fully expects "significant" losses to continue "on a quarterly and annual basis" for the "foreseeable future." Read in conjunction with the trends reflected by the graphical depictions on page 25 of the prospective, outlined in footnote 7 herein, and given

that this prospectus became effective within two weeks of the quarter's end, a reasonable investor would have been well aware of the *reality* of continuing and sizeable losses for the coming quarters and coming year or years. *See I. Meyer Pincus & Associates*, 936 F.2d at 762 ("the prospectus states exactly the 'fact' that [the plaintiff] contends has been covered up"); *Olkey*, 98 F.3d at 5 ("The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed."); *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998) ("Courts will dismiss claims under [Sections 11 and 15] if they charge omissions of what was in fact disclosed."). Additionally, the implicit argument in the plaintiffs' position—that N2K's financial standing would meet or beat Wall Street's expectations—cannot be reasonably inferred in light of the warnings discussed above and

the others in the prospectus.[9] The prospectus was therefore not made materially misleading by the defendants' omission of its financial data for the first quarter of 1998. Accordingly, the plaintiff has failed to state a claim upon which relief can be granted,[10] and the defendants' motion to dismiss both against the corporation and the individual defendants is GRANTED.

## III. CONCLUSION

For the reasons discussed above, the defendants' motion to dismiss is GRANTED, and the plaintiff's complaint in DISMISSED with prejudice. The Clerk of the Court is directed to close this case. **SO ORDERED.**

9. For example, in one risk factor entitled "Potential Fluctuations in Quarterly Results," the prospectus warns that N2K "expects to experience significant fluctuations in future quarterly operating results that may be caused by a variety of factors, many of which are outside the Company's control." (Prospectus at 13.) These fluctuations were similarly evident in the tables on pages 6 and 25 of the prospectus that presented a numeric breakdown of N2K's finances over the previous years.

10. Because the Court has resolved this motion on the merits, the viability of the plaintiffs' amended class action complaint under the pleading requirements of Fed.R.Civ.P. 9(b) need not be fully addressed at this juncture. I am of the opinion, however, that to the extent allegations underlying a Securities Act claim are based in fraud, the strict pleading requirements of Rule 9(b) do apply. Fed. R.Civ.P. 9(b) ("In *all* averments of fraud or mistake, the circumstances constituting fraud ... shall be stated with particularity.") (emphasis added); *see Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 795 (S.D.N.Y. 1997) ("if plaintiffs have plead fraud [under Section 11], they must comply with the requirements of Rule 9(b)"); *Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180, 1189 (S.D.N.Y.1996) (applying Rule 9(b) "[w]here the allegations underlying claims under the Securities Act are ... based in fraud"); *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1404–5 (9th Cir.1996) ("We now clarify that the particularity re-

quirements of Rule 9(b) apply to claims brought under Section 11 when ... they are grounded in fraud."), *cert. denied sub nom.*, *Anderson v. Clow*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997); *Melder v. Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) ("When 1933 Securities Act claims are grounded in fraud rather than negligence ... Rule 9(b) applies."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3rd Cir.1992) (affirming district court's ruling that 9(b) applies to Section 11 claims sounding in fraud), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). *But see In re In–Store Advertising Securities Litigation*, 878 F.Supp. 645 (S.D.N.Y.1995) ("[B]ecause proof of fraud is not necessary to prevail on a Section 11 claim ... Rule 9(b) does not apply to a section 11 claim."); *Nelson v. Paramount Communications, Inc.*, 872 F.Supp. 1242, 1246 (S.D.N.Y.1994) (same); *In re NationsMart Corp. Securities Litig.*, 130 F.3d 309, 314 (8th Cir.1997) ("[T]he particularity requirement of Rule 9(b) does not apply to claims under Section 11 of the Securities Act...."). The plaintiffs' allegation that N2K knew of, but purposely withheld, its first quarter 1998 results is, on its face, based in fraud. That being said, I suspect the level of particularity stated in the plaintiffs' amended complaint is insufficient to survive a thorough analysis under the Rule, and the plaintiffs' complaint would properly be dismissed on this ground as well.