Brian **DEMARIA**, Robert Brisken, Edward Sisco and Terry C. Whorton, individually and on behalf of all others similarly situated, Plaintiffs,

v.

William P. **ANDERSEN**, III, Peter W. Minford, Bruns H. Grayson, Peter C. Morse, Randall E. Poliner, ING Baring Furman Selz LLC, Warburg Dillon Read LLC, KPMG LLP and ILife.com, Inc., Defendants.

**No. 00 CIV 2337 WHP.**

United States District Court, S.D. New York.

March 29, 2001.

---

I. Stephen Rabin, Brian P. Murray, Rabin & Peckel, LLP, New York City, for Plaintiffs.

Jay B. Kasner, William A. McBride, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendants ING Baring Furman Selz LLC and Warburg Dillon Read LLC.

Martin I. Kaminsky, Pollack & Kaminsky, New York City, for Defendant ILife.com, Inc. and individual defendants.

### MEMORANDUM AND ORDER

PAULEY, District Judge.

This is a securities class action arising out of the May 13, 1999 initial public offering ("IPO") of ILife.com, Inc. (formerly known as Intelligent Life Corporation) in which the company issued 3,500,000 shares of common stock priced at $13 per share. Subsequent to the offering, on May 24, 1999, ILife announced its 1999 first quarter results, including an increase in net losses to $6,207,000 from $703,000 in the first quarter ended March 31, 1998. Following this announcement, the stock price of ILife steadily declined and on June 14, 2000, the day before the plaintiffs filed their amended complaint, stood at $1.75 per share.

Plaintiffs bring this action on behalf of all persons or entities who purchased ILife common stock during the period May 13, 1999 through June 15, 2000. Plaintiffs sue ILife and five of its officers and directors who signed the registration statement (collectively, the "ILife Defendants"), the two lead underwriters ING Barings Furman Selz LLC and Warburg Dillon Read LLC (the "Underwriter Defendants"), and the accounting firm of KPMG LLP for violations of Section 11, Section 12(a)(1) and Section 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(1) & 77o. The ILife Defendants and the Underwriter Defendants move to dismiss the amended complaint pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure. By stipulated order, defendant KPMG has been dismissed from this action without prejudice.

### Factual Background

The following facts are drawn from the amended complaint, publicly available documents filed with the Securities and Exchange Commission ("SEC") incorporated by reference into the amended complaint, and other documents that form the record in this action.

Plaintiffs are purchasers of ILife common stock following the company's May 13, 1999 IPO. (Amended Class Action Complaint For Violations Of Federal Securities Laws dated June 15, 2000 ("Am. Compl.") ¶¶ 8–11.) Because three of the four named plaintiffs purchased stock no earlier than six months after the IPO, plaintiffs rely solely on the more immediate purchases of named plaintiff DeMaria to support their standing to bring this lawsuit.[1] (*See* Transcript of Oral Argument ("Tr.") dated October 12, 2000 at 17.) More specifically, on May 17, 1999, plaintiff DeMaria's IRA—three days after the IPO at a price of $12.75—purchased 4,000 share of ILife from Morgan Stanley, a secondary underwriter not named as a defendant in this lawsuit. (*See* Decl. Of Brian Murray In Support Of The DeMaria Group's Motion To Be Appointed Lead Plaintiff And For Approval Of Its Selection Of Lead Counsel, Ex. 3.)

Defendant ILife creates, produces and syndicates personal finance information through Web sites, print publications, and broadcast segments. (Am.Compl.¶ 28.) Defendants William P. Anderson III, Peter W. Minford, Bruns H. Grayson, Peter C. Morse and Randall E. Poliner served either as officers and/or directors of ILife during the relevant time period and each signed the registration statement. (Am. Compl.¶¶ 13–15.) The Underwriter Defendants participated in the IPO as lead underwriters. (Am.Compl.¶¶ 16–17.)

In connection with its IPO, ILife filed an initial registration statement (including a prospectus) with the SEC on March 11, 1999. (Am.Compl.¶ 29.) On May 13, 1999, the SEC declared ILife's registration statement (the "Registration Statement") and prospectus (the "Prospectus") effective. (Am.Compl.¶ 30.) Thereafter, pursuant to 17 C.F.R. § 230.424(b)(1), ILife electronically filed its Registration Statement and Prospectus (the "Electronic Prospectus") with the SEC through the EDGAR filing system.[2] (*See* Am. Compl. ¶ 31; Ex. B to Decl. of Jay B. Kasner dated July 17, 2000 ("Kasner Decl.").)

All investors who purchased shares in the IPO were provided with a printed copy of the Prospectus (the "Printed Prospectus"). (*See* Am. Compl. ¶¶ 2, 33; Ex. A to Kasner Decl.) At page 5, the Printed Prospectus contained a bar graph depicting historical online publishing revenues and net losses on a quarterly basis for the 1998 calendar year and the first quarter of 1999. For purposes of the electronic filing, ILife prepared a narrative description of the bar graph pursuant to SEC regulations. *See* 17 C.F.R. § 232.304(a) (2000). A comparison, however, of the bar graph in the

---

1. When questioned about standing during oral argument, plaintiffs' counsel responded that "I point to Mr. DeMaria. He is the person upon whom we are relying. The fact is that he purchased in the public offering from one of the underwriters, that is, Morgan [Stanley]." (Tr. at 17.)

2. "EDGAR" is an acronym for the Electronic Data Gathering, Analysis and Retrieval system implemented in 1993 by the SEC to permit companies to file certain documents in electronic format. *See* 17 C.F.R. § 232.101 (2000).

Printed Prospectus with the narrative in the Electronic Prospectus reveals a discrepancy: the Electronic Prospectus identified ILife's net losses as publishing revenues and omitted any reference to net losses.[3] (*See* Am. Compl. ¶¶ 37–38.)

Seizing upon this discrepancy, plaintiffs allege that the "prospectus contained in the registration statement declared effective by the SEC and filed with the SEC," *i.e.*, the Electronic Prospectus, "is not the prospectus pursuant to which Ilife.com common stock was offered to the investing public," *i.e.*, the Printed Prospectus. (Am. Compl. ¶ 32.) Thus, pursuant to Section 12(a)(1) of the Securities Act, plaintiffs seek rescission of their purchases of ILife shares on the ground that they are "unregistered securities." (Am.Compl.¶¶ 33, 52–55.)

In addition, the amended complaint avers that the Prospectus was materially false and misleading in violation of Sections 11 and 15 of the Securities Act because it failed to disclose the financial results for the quarter ended March 31, 1999, even though that quarter ended forty-three days before the IPO. In particular, on May 24, 1999, eleven days after the effective date, ILife announced in a press release that, in the first quarter ended March 31, 1999, the company's net loss increased dramatically to $6,027,000 and revenues totaled approximately $2,226,000. (Am. Compl. ¶ 49; Press Release dated May 24, 1999, attached as Ex. C to Kasner Decl.) The amended complaint alleges that the company's 1999 second and third quar-

ter results further project the decline in the company's profitability. (*See* Am. Compl. ¶ 50.) In light of the May 1999 press release and other post-IPO disclosures, plaintiffs submit that the Prospectus misrepresented and omitted a number of material facts that reflected the true financial condition of the company. Those material facts include: (i) a purported reversal in the trend of 25% revenue growth; (ii) a substantial increase in the ratio of net loss to revenue; (iii) an increase in stockholder deficit as reflected on the company's balance sheet for the period ending December 31, 1998; and (iv) the manner in which the proceeds of the IPO would be applied. (*See* Am. Compl. ¶¶ 42, 44, 45–48.)

Defendants assert that when measured against the actual disclosures in the Prospectus, plaintiffs' allegations are factually overstated or incorrect. For example, plaintiffs charge that the undisclosed results for the first quarter of 1999 show that revenue increased by "a mere 10% over the December 1998 quarter," a claimed reversal of the "promising trend of revenue growth of at least 25% per quarter." (Am.Compl.¶¶ 40–42.) Defendants maintain that this allegation is overstated due to plaintiffs' inaccurate rounding of revenue figures. Defendants argue that the actual reported figures show ILife's quarterly growth in 1998 to be uneven and belie plaintiffs' assertion that the company's quarterly revenue growth in 1998 exceeded 25%:

| Comparison of ILife's Quarterly Revenue | | | | | |
|---|---|---|---|---|---|
| | 3/31/98 | 6/30/98 | 9/30/98 | 12/31/98 | 3/31/99 |
| Am. Compl. | $950,000 | $1,200,000 | $1,600,000 | $2,000,000 | $2,200,000 |

3. The amended complaint does not allege that this discrepancy was the product of wrongful intent. Indeed, plaintiffs elected to drop the Rule 10b–5 claim asserted in the original complaint. (*See* Class Action Complaint For Violations Of Federal Securities Laws dated March 27, 2000.)

| ¶¶ 41–42 | | (+26%) | (+33%) | (+25%) | (+10%) |
|---|---|---|---|---|---|
| Figures reported by ILife [4] | $950,000 | $1,203,000 (+26%) | $1,583,000 (+31%) | $1,886,000 (+19%) | $2,226,000 (+18%) |

As the above chart demonstrates, the actual reported increase in revenue for the first quarter of 1999 was 18%, virtually the same percentage as at the end of the prior year and much larger than the 10% incorrectly alleged by plaintiffs.

In addition, plaintiffs allege that ILife "suffered a massive loss in the March 1999 quarter which was undisclosed to investors as the time of the [IPO]." (Am.Compl.¶ 3.) As a by-product of this omission, plaintiffs claim that the Prospectus failed to disclose ILife's net loss as a percentage of revenue, which increased from 68% at six months ended December 31, 1998 to 270% for the first quarter ended March 31, 1999 (Am. Compl.¶¶ 43–44), and that ILife's stockholders' deficit grew as well (Am. Compl.¶ 46).

Defendants respond that ILife included in the Prospectus substantial disclosure with respect to its first quarter 1999 results. Consistent with the May 24, 1999 press release, the Prospectus disclosed that ILife sustained a loss of approximately $6 million in the first quarter of 1999. The Printed Prospectus, at page 5, contains a bar graph showing in part the company's historic net losses over five quarters, including the quarter ended March 31, 1999. For the first quarter of 1999, the graph shows an approximate $1.5 million loss for on-line publishing operating results and, in the narrative portion just below, shows a non-cash charge of $1,893,000 in compensation expenses and a non-cash $2,665,000 financing charge.

Moreover, in the section entitled "Risk Factors," an italicized prefatory disclaimer cautioned that "[a]n investment in our common stock involves a high degree of risk." (Printed Prospectus at 8.) Immediately thereunder, the Prospectus warned in bold lettering that ILife had a "history of losses" and reported that the company "incurred net losses of approximately $2,782,000, $956,000 and $672,000 for the years ended June 30, 1998, 1997 and 1996 and a net loss of $2,095,000 for the six months ended December 31, 1999." In the next sentence, the Prospectus advised: "We anticipate that we may incur operating losses in the future due to a high level of planned expenditures. Furthermore, we will incur significant noncash charges during the next four years. Although our revenue has grown rapidly in recent periods, such growth may not continue and may not lead to profitability." (*See* Printed Prospectus at 8.) As to the growth in stockholders' deficit, defendants contend that this information was readily ascertainable by subtracting the first quarter 1999 loss from the December 1998 stockholder equity (deficit), both of which were disclosed in the Prospectus. (*See* Printed Prospectus at 5, 15, 17.)

Plaintiffs also claim that the Prospectus misrepresented the use of proceeds from the IPO. Specifically, the amended complaint alleges that the description in the Prospectus about use of proceeds was materially false and misleading "because not all of the net proceeds were available to be

---

**4.** *See* Printed Prospectus at 23; Press Release dated May 24, 1999 attached as Exhibit C to Kasner Decl. This Court notes that the only alleged, and perceptible, difference between the printed and electronic versions of the Prospectus is the failure to accurately reproduce the graphic material at page 5. Thus, all citations are to the Printed Prospectus, unless otherwise indicated.

used for working capital." (Am. Compl.¶ 47.) In this regard, defendants maintain that plaintiffs misstate the Prospectus, pointing to the portion of the Prospectus that provided that the proceeds would "primarily" be used "as working capital for expansion of our business," including "for general corporate purposes." (Printed Prospectus at 14.) On this same subject, the Prospectus also stated:

> The net proceeds from the sale of the common stock will become part of our general working capital upon completing of this offering, and we may use these funds in a variety of ways, including our sales and marketing activities, increasing our content development activities and pursuing strategic acquisitions and partnerships. We will have considerable discretion in the application of the net proceeds of this offering to these uses. In addition, the timing of our use of the net proceeds will depend on a number of factors, including the amount of our future revenues.

(Printed Prospectus at 12.)

### Discussion

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995).

■ Because the motions to dismiss in this action are directed to a complaint brought under the federal securities laws,

this Court may consider documents, such as the Prospectus at issue, that are integral to plaintiffs' claims and incorporated by reference in the pleadings. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808–09 (2d Cir.1996) (documents "integral" to the complaint may be consulted in full even though only partially quoted therein); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985) ("the pleading is deemed to include any document attached to it as an exhibit ... or any document incorporated in it by reference"). Defendants in securities actions are permitted to produce the prospectus when challenging the legal sufficiency of a complaint because a "plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991). "If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations in the complaint." *Steinberg v. PRT Group, Inc.*, 88 F.Supp.2d 294, 300 (S.D.N.Y.2000).

### I. The Section 12(a)(1) Claim

■ Plaintiffs' first claim for relief seeks recovery under Section 12(a)(1) of the Securities Act. Section 12(a)(1) provides that:

> Any person who ... offers or sells a security in violation of [Section 5] ... shall be liable, subject to [the loss causation provision] of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such securi-

ty, or for damages if he no longer owns the security.

15 U.S.C.A. § 77l(a)(1) (West 1997).

The Section 12(a)(1) claim is predicated solely on the discrepancy between the graphic matter in the Printed Prospectus and the corresponding, but erroneous, narrative in the Electronic Prospectus. Plaintiffs allege the Printed Prospectus, pursuant to which defendants sold ILife common stock to the public, "was neither the prospectus that was part of the registration statement declared effective by the SEC nor the prospectus filed with the SEC," rendering the shares sold in the IPO unregistered securities under Section 5 of the Securities Act. (Am.Compl.¶ 53.) Based on this allegation, plaintiffs assert that defendants offered or sold securities in violation of Section 12(a)(1) of the Securities Act and, therefore, are strictly liable to members of the putative class.

The ILife Defendants set forth two arguments in support of dismissal of this claim: (i) plaintiffs lack standing under Section 12(a)(1) because they fail to plead that they purchased from a statutory seller as part of the IPO; and (ii) liability under Section 12 is foreclosed by SEC Rule 304, 17 C.F.R. § 232.304. The Underwriter Defendants join and supplement those two arguments and thirdly contend that the Section 12 claim should be dismissed as against them because plaintiffs fail to allege tender of their securities.[5]

A. *Plaintiffs' standing to sue under Section 12(a)(1)*

█ Although the Securities Act does not define the term "seller," the Supreme Court in *Pinter v. Dahl,* 486 U.S. 622, 642, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), limited liability to those sales that take place within the context of buyer-seller relationships resembling traditional contractual privity. *See also Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 638 (S.D.N.Y.1999). Section 12(a)(1) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644 n. 21, 108 S.Ct. 2063. In addition, Section 12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve his own financial interest or those of the securities owner. *Pinter,* 486 U.S. at 647, 108 S.Ct. 2063; *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988).

█ Here, the amended complaint does not aver that any defendant was the immediate seller to any named plaintiff, nor does it even state any named plaintiff purchased in the ILife IPO. It merely alleges that the named plaintiffs purchased "during the Class Period" (Am.Compl.¶¶ 8–11), defined as "the period May 13, 1999 through June 15, 2000 inclusive" (Am. Compl.¶ 1). In addition, there are no allegations that any defendant actively solicited any named plaintiff in connection with the sale of ILife stock.

In response to those pleading deficiencies, plaintiffs offer two arguments. To support the general notion that they have standing to bring suit under Section 12(a)(1), plaintiffs stipulate that they rely exclusively on plaintiff DeMaria's pur-

---

**5.** The Underwriter Defendants also argue that since plaintiffs state that their first claim is brought "pursuant to Section 5 of the Securities Act" (Am.Compl.¶ 52), that claim must fail because there is no private right of action under Section 5. *See Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 223–24 (S.D.N.Y.1973). This argument is devoid of merit. The amended complaint plainly states that the first claim for relief is brought pursuant to "Section 12 of the Securities Act." (Am. Compl. ¶ 55.)

chases. The record shows that DeMaria's IRA purchased 4,000 shares of ILife common stock on May 17, 1999 from Morgan Stanley, which served as a secondary underwriter in the IPO. Morgan Stanley, however, is not named as a defendant in this action. Thus, sales by Morgan Stanley of ILife common stock cannot support plaintiffs' bid for standing as the amended complaint currently is pleaded. Plaintiffs also argue that they have standing to sue the ILife Defendants on the strength of case law holding that the mere allegation of signing the registration statement constitutes active solicitation, at least for purposes of withstanding a motion to dismiss. *See, e.g., Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1315 (S.D.N.Y. 1996).

On balance, while the allegations may suffice to sustain plaintiffs' standing to sue the ILife Defendants, no facts as alleged in the amended complaint or drawn from the record before this Court support plaintiffs' standing to sue the Underwriter Defendants. *See Akerman v. Oryx Comms., Inc.*, 609 F.Supp. 363, 373 (S.D.N.Y.1984), *aff'd*, 810 F.2d 336 (2d Cir.1987); *Klein v. Computer Devices, Inc.*, 602 F.Supp. 837, 840 (S.D.N.Y.1985).

### B. *Application of SEC Rule 304*

█ Even assuming that plaintiffs have standing to sue all the defendants and are granted leave to amend to join Morgan Stanley, the Section 12(a)(1) claim nevertheless must fail as a matter of law. SEC Rule 304 governs the manner in which graphic, image, audio or video material contained in a document delivered to investors must be described in an electronic filing. 17 C.F.R. § 232.304 (2000). Rule 304(a) requires the electronically filed ver-

sion of the document to "include a fair and accurate narrative description, tabular representation or transcript of the omitted material." 17 C.F.R. § 232.304(a). Significantly, subsection (b)(1) of Rule 304 provides that "[t]he graphic, image, audio or video material in the version of a document delivered to investors and others is deemed part of the electronic filing." 17 C.F.R. § 232.304(b)(1).

SEC Rule 304(b)(1) is fatal to plaintiffs' Section 12(a)(1) claim. By operation of the Rule, the graphic material included in the Printed Prospectus, but omitted from the Electronic Prospectus filed via the EDGAR system, was "deemed part of" the Registration Statement filed with, and declared effective by, the SEC. As a result, there is no cognizable claim that the registration of ILife shares was defective and that ILife shares were sold in contravention of Section 5. Therefore, there is no violation of Section 12(a)(1).

Accordingly, the amended complaint's first claim for relief is dismissed as against all defendants. Leave to replead is denied because amendment would be futile in light of SEC Rule 304.[6] *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.1995.)

### II. *The Section 11 Claim*

Plaintiffs' second claim for relief seeks recovery under Section 11 of the Securities Act. Section 11(a) provides that certain specified persons, including every person who signed the registration statement and every underwriter, may be sued "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact

---

**6.** Because plaintiffs' first claim for relief is dismissed on the basis of SEC Rule 304, this Court expressly declines to reach the issue of whether plaintiffs' failure to allege tender of their ILife shares bars their claim under Section 12(a)(1).

required to be stated therein or necessary to make the statements made therein not misleading" by any person "acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission)." 15 U.S.C.A. § 77k(a) (West 1997).

Plaintiffs allege that the Prospectus was materially false and misleading because it failed to include the first quarter 1999 results which "revealed that the net loss and net loss as a percentage of revenue had increased dramatically and the trend of revenue growth of at least 25% has ended." (Am.Compl.¶ 58.) Plaintiffs also cite to purported misstatements in the Prospectus relating to the use of the IPO proceeds, the stockholder deficit as described in the balance sheet, and the disclosure of publishing revenues in the Electronic Prospectus. (Am.Compl.¶ 58.) Defendants interpose a multi-layered challenge to the legal sufficiency of the Section 11 claim. As a threshold argument, defendants contend that plaintiffs do not have standing to sue because plaintiffs only allege purchases of ILife shares in the secondary market, not as part of the public offering. In addition, defendants assert that dismissal is warranted because ILife was not obligated to disclose the first quarter 1999 results and because, nevertheless, the misstatements and omissions charged in the amended complaint were adequately disclosed by ILife in the Prospectus.

A. *Plaintiffs' standing to sue under Section 11*

Under long-standing precedent in the Second Circuit, purchasers who can "trace the lineage of their shares" to the challenged registration statement have standing to sue under Section 11 of the Securities Act. *See Barnes v. Osofsky*, 373 F.2d 269, 271 (2d Cir.1967). Defendants argue that the Supreme Court's decision in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), effectively overrules *Barnes* and limits standing under Section 11 to purchasers in a public offering, to the exclusion of secondary market purchasers. Defendants also argue that the language of Section 11 together with the legislative history of the Securities Act supports this conclusion. Recognizing that the Second Circuit has yet to reach this issue, this Court disagrees with defendants and upholds plaintiffs' standing to sue under Section 11.

The holding in *Gustafson* does not compel a departure from the standard for Section 11 standing articulated in *Barnes*. In *Gustafson*, the Supreme Court addressed the narrow issue of whether a private agreement to sell securities, executed some twenty years after the issuance of the stock, constituted a "prospectus" for purposes of liability under Section 12(2) of the Securities Act (now codified as Section 12(a)(2)). 513 U.S. at 564, 115 S.Ct. 1061. Because the purchase agreement at issue had been used in connection with a private secondary transaction, not a public offering, the Supreme Court held that it was not a "prospectus" for purposes of the Securities Act. *Gustafson*, 513 U.S. at 584, 115 S.Ct. 1061. In dicta, the Supreme Court cited legislative history of the Sections 11 and 12 reflecting the view that the civil liability imposed by those sections "affects only new offerings of securities" and not "the ordinary redistribution of securities." *Gustafson*, 513 U.S. at 580–81, 115 S.Ct. 1061.

Although one court in this District found that the principles discussed in *Gustafson* "apply equally" to Section 11 and limited standing to purchasers in an initial public distribution of securities, *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 1997 WL 576023 (S.D.N.Y. Sept.15, 1997), the sub-

stantial weight of authority in this Circuit adheres to the holding of *Barnes*. In what has emerged as a seminal case applying *Gustafson* to Section 11 claims, Judge Sweet concluded that "[t]o limit liability only to buyers in the IPO and not to buyers who can trace their shares to the registration statement allows the issuers to escape a margin of liability" that Section 11 was intended to cover. *Adair v. Bristol Tech. Sys., Inc.,* 179 F.R.D. 126, 133 (S.D.N.Y.1998). This Court's review of decisions since *Adair* reveals that no court in the Second Circuit has held that secondary market purchasers lack standing to pursue claims under Section 11. *See In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 694 (S.D.N.Y.2000) (Preska, J.) ("plaintiffs making after-market purchases who can trace their securities to the Offering have standing under Section 11"); *In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 202 (E.D.N.Y.2000) (Spatt, J.) (Section 11 "not limited to purchasers who directly participated in the public offering covered by the allegedly misleading registration statement" but extends to stock "traceable" to the registration statement); *Milman v. Box Hill Sys. Corp.,* 192 F.R.D. 105, 109 (S.D.N.Y.2000) (Scheindlin, J.) ("secondary market purchasers who can trace their shares to a registered offering have standing to assert claims under § 11"); *Salomon Smith Barney v. Asset Securitization Corp.,* No. 98 Civ. 4186, 1999 WL 1095605, at *3 (S.D.N.Y. Dec. 3, 1999) (Jones, J.) (secondary market purchasers have standing under Section 11); *In re Fine Host Corp. Sec. Litig.,* 25 F.Supp.2d 61, 66–68 (D.Conn.1998) (Hall, J.) (Section 11 does not extend only to purchases made in the initial offering, but to purchases in the secondary market as well).

The plain language of Section 11 confirms that it confers standing to purchasers in the secondary market. By its terms, Section 11(a) applies to "any person acquiring such security." 15 U.S.C.A. § 77k(a). Section 11(a) also provides that if a "person acquired the security after the issuer has made generally available to its securities holders an earning statement covering a period of at least twelve months beginning after effective date of the registration statement," then the right of recovery is conditioned on proof that the person relied in fact on the false statement in the registration statement. 15 U.S.C.A. § 77k(a). Congress therefore explicitly recognized that an "after" or secondary market purchaser, even well after completion of a public distribution, has a remedy under Section 11. *See Milman,* 192 F.R.D. at 108; *Adair,* 179 F.R.D. at 132.

The statute's damages provision further supports this conclusion. Section 11(e) states that damages are to be calculated based on the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and . . . the value thereof as of the time such suit was brought." 15 U.S.C.A. § 77k(e). If Section 11 applied only to initial purchasers, all sales would be at the offering price and the statutory language capping damages at the price "the security was offered to the public" would be surplusage. To give meaning to this clause, Section 11 must apply to secondary market transactions. *See Milman,* 192 F.R.D. at 108; *Adair,* 179 F.R.D. at 133.

Here, plaintiffs have satisfied their pleading burden to establish standing. The amended complaint alleges that plaintiffs purchased their ILife shares "pursuant or traceable to the Registration Statement." (Am.Compl.¶ 61.) Accordingly, defendants' motion to dismiss the Section 11 claim for lack of standing is denied.

B. *Liability under Section 11*

Beyond their challenge to plaintiffs' standing to sue, defendants argue that the Section 11 claim cannot be sustained as a matter of law because ILife had no obligation to disclose quarterly information and, in any event, the Registration Statement was not materially false or misleading and the omissions identified in the amended complaint were in fact adequately disclosed.

"The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus." *In re N2K, Inc. Sec. Litig.,* 82 F.Supp.2d 204, 207 (S.D.N.Y.), *aff'd,* 202 F.3d 81 (2d Cir. 2000); *accord Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 131–32 (2d Cir.2000) (compliance with Rule 10b–10 renders allegedly omitted information immaterial as a matter of law). Item 302(a) of Regulation S–K mandates disclosure of certain financial information "for each full quarter within the two most recent fiscal years and any subsequent interim period for which financial statements are included or are required to be included by Article 3 of Regulation S–X." 17 C.F.R. § 229.302(a) (2000). In turn, Article 3 of Regulation S–X provides that interim financial reports, such as ILife's first quarter 1999 results, shall be included where the financial statements in the registration statement are "as of a date 135 days or more prior to the date the [registration statement] is expected to become effective." 17 C.F.R.

§ 210.3–12(a) (2000). Stated another way, the most recent financial statements cannot be more than 135 days old. ILife's Registration Statement contained financial statements for the period ending December 31, 1998 and was declared effective on May 13, 1999, within the 135 day window prescribed by Regulation S–X. Consequently, pursuant to applicable SEC regulations, ILife was not required to include its first quarter 1999 results.[7] *See In re N2K,* 82 F.Supp.2d at 207; *Gart v. Electroscope, Inc.,* 24 F.Supp.2d 969, 974 (D.Minn.1998).

Plaintiffs contend that a duty to disclose nevertheless arose because the non-public information represented "an extreme departure from the range of results which could be anticipated based on currently available information." *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1210 (1st Cir.1996). This argument cannot salvage plaintiffs' Section 11 claim because, first, the amended complaint contains a number of conclusory statements and characterizations that are not based in fact and, second, the Prospectus made substantial disclosure with respect to the precise omissions that undergird plaintiffs' claim. On the latter point, courts in this Circuit consistently have dismissed claims under Section 11 "if they charge omission of what was in fact disclosed." *Hinerfeld v. United Auto Group,* No. 97 Civ. 3533(RPP), 1998 WL 397852, at *4 (S.D.N.Y. July 18, 1998); *accord Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir.1996) ("This court has consis-

---

**7.** Plaintiffs argue that Item 303(a) of Regulation S–K compels a different result. *See* 17 C.F.R. § 229.303(a) (2000) (management discussion and analysis of financial condition and results of operations). Item 303(a), however, applies to the disclosure of information annually rather than on a quarterly basis and requires the registrant to provide year-to-year final comparisons over a three or five year period covered by the financial statements.

*See* 17 C.F.R. § 229.303(a) & Instruction 1; *see also* II Louis Loss & Joel Seligman, *Securities Regulation* at 690 (3d ed. 1999) (Item 303(a) "requires managements of all registrants to discuss and analyze financial conditions and results of operations for full fiscal years"). Nothing in Item 303(a) calls for greater disclosure with respect to financial results than Item 302(a).

tently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus.").

The amended complaint charges that the first quarter 1999 results show a reversal of a "promising trend of revenue growth of at least 25% per quarter." (Am. Compl.¶ 42.) This is demonstrably untrue. As detailed in the chart set forth earlier in this opinion, the quarterly 1998 net revenues disclosed in the Prospectus show an increase of 26% from $960,000 for the first quarter ended March 31, 1998 to $1,203,000 for the second quarter ended June 30, 1998; a 31% increase to $1,583,000 for the third quarter ended September 30, 1998; and a 19% increase to $1,886,000 for the fourth quarter ended December 31, 1998. Only by improperly rounding the quarterly figures do plaintiffs manufacture the theory of 25% quarter-to-quarter revenue growth.

Moreover, ILife's reported first quarter 1999 revenues of $2,226,000 reflect an 18% increase from the prior quarter and a 134% increase from the corresponding period of the prior year. Thus, not only was there no trend of 25% growth, there was no reversal of a growth trend. In light of ILife's actual reported revenues, plaintiffs also cannot seriously argue that ILife should have disclosed its first quarter 1999 revenues in the Prospectus, notwithstanding Regulation S–X, because those revenues represented an "extreme departure" from the range of anticipated results so as to make actionable ILife's non-disclosure of revenues for the first quarter of 1999. *See In re N2K,* 82 F.Supp.2d at 208 (holding that growing losses not "extreme departure" from range of anticipated results as to make non-disclosure actionable); *Gart,* 24 F.Supp.2d at 974 (holding that revenues reported as 22% lower than same period in the prior year, but 25% higher than immediately preceding period not

"extreme departure" from range of anticipated results as to make non-disclosure actionable). This is especially true given the Prospectus's cautionary language about the possibility of fluctuations in the results of the company's operations:

> Our future revenues and results of operations may be difficult to forecast.... As a result, we believe that period-to-period comparisons of our results of operations may not be meaningful, and you should not rely on past periods as indicators of future performance. In future periods, our results of operations may fall below the expectations of securities analysts and investors, which could adversely affect the trading price of the common stock.

(Printed Prospectus at 12.)

In addition, the amended complaint avers that the Prospectus failed to disclose that the trend of the declining ratio of net loss as a percentage of revenue had ended (Am.Compl.¶¶ 43–44) and that there was a significant increase in stockholders' deficit as reflected on the balance sheet for the period ended December 31, 1998 (Am. Compl.¶¶ 45–46). Although garbed in more elaborate dress, those two allegations reduce to the fundamental claim by plaintiffs that ILife did not disclose the $6,027,000 net loss reported in the first quarter of 1999. (*See* Am. Compl. ¶ 3 (referring to the "massive loss" suffered by ILife in March 1999 that "was undisclosed to investors at the time of the Offering").) Contrary to the allegations in the amended complaint, the Prospectus made substantial disclosure with respect to the first quarter's net loss.

The Prospectus detailed each of the major components of the $6,207,000 net loss announced following the IPO on May 24, 1999. At page 5 of the Printed Prospectus, ILife reported a net loss of nearly $1,500,000 in on-line publishing revenues, a

non-cash charge of $1,893,000 for compensation expenses, and non-cash $2,666,000 financing charge. This quantitative disclosure is amplified in qualitative terms by the conspicuous cautionary statements in the section of the Prospectus titled "Risk Factors." There, among other things, the Prospectus described the history of ILife's net losses over the prior three years and flatly warned that the company "anticipate[s] that we may incur operating losses in the future due to a high level of planned expenditures." (Printed Prospectus at 8.) Given ILife's disclosure of the principal omission charged in the amended complaint, it cannot be credibly argued that a reasonable investor would have been misled about the true financial condition of the company. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). By virtue of uncomplicated calculations, the Prospectus' disclosure of ILife's loss would have placed any reasonable investor on notice that, holding the rate of revenue growth constant, net loss as a percentage of revenue would have increased dramatically from the prior quarter and that the stockholders' deficit would have grown as well. *See Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1988) ("failure to perform ... calculation for investors" did not significantly alter total mix of information).

In summary, because the Prospectus disclosed the fact plaintiffs charge to have been omitted, non-disclosure of the first quarter 1999 results did not render the Prospectus materially misleading under Section 11. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (prospectus not materially misleading where it "states exactly the 'fact' that [the plaintiff] contends has been covered up"); *In re N2K,* 82 F.Supp.2d at 209–10 (omission of quarterly results showing growing losses not materially misleading because prospectus explicitly disclosed expectation that significant losses would continue for the foreseeable future).

■ Much of the same can be said for plaintiffs' allegation with respect to ILife's use of proceeds from the IPO. Plaintiffs maintain that the Prospectus was false and misleading because it misstated the use of proceeds, claiming that they would be "used for working capital." (Am. Compl.¶¶ 47–48.) What misrepresentation plaintiffs complain of is not clear. First, the Prospectus only states that proceeds from the IPO would be used "primarily" as working capital and that ILife had "broad discretion" in how the proceeds would be used. Second, ILife's alleged use of the proceeds in part to repay the losses does not constitute a misstatement because a function of working capital is to fund operations. *E.g., Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 575–58 (2d Cir.1985) (discussing outside financing as source of working capital to fund operations).

Last, plaintiffs allege that the Electronic Prospectus was false and misleading because it misstated ILife's revenues. (Am. Compl.¶¶ 37–38.) This allegation lacks merit. As stated earlier in this opinion in the context of the Section 12 claim, accurate revenue figures were disclosed because, by operation of SEC Rule 304(b)(1), the correctly represented graphic material in the Printed Prospectus is deemed part of the Electronic Prospectus. *See* 17 C.F.R. § 232.304(b)(1). Further, since the amended complaint alleges that the Printed Prospectus, not the Electronic Prospectus, was distributed to investors (Am.

Compl.¶ 2), the contents of the Electronic Prospectus would not have altered materially the total mix of information available to the public. *See United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir.1993) (document filed with SEC but not distributed to shareholders does not significantly alter the "total mix" of information available).

Accordingly, plaintiffs' second claim for relief is dismissed as against all defendants. Leave to amend is denied. Plaintiffs already have amended their complaint once. Further amendment would be futile and a waste of judicial resources because liability under Section 11 is foreclosed by Regulation S–X and belied by the ample disclosures in the Prospectus. *See Zahra*, 48 F.3d at 685; *In re N2K*, 82 F.Supp.2d at 208; *Hinerfeld*, 1998 WL 397852, at *8.

III. *The Section 15 Claim*

■ In their third claim for relief, plaintiffs seek to recover against defendants Anderson and Minford as controlling persons under Section 15 of the Securities Act. 15 U.S.C.A. § 77o (West 1997). In order to survive a motion to dismiss a claim under Section 15, plaintiffs must allege: (i) an underlying primary violation of the securities laws by the controlled person; (ii) control over the controlled person; and (iii) particularized facts as to the controlling person's culpable participation in the violation of the controlled person. *See In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 440–41 (S.D.N.Y.2000); *Ellison*, 36 F.Supp.2d at 637–38. Because plaintiffs have failed to state an underlying violation under Section 12(a)(1) and Section 11, their claim under Section 15 must fail as well and is dismissed.

### Conclusion

Based on the foregoing discussion, defendants' motions to dismiss for failure to state a claim are granted. The amended complaint is dismissed, with prejudice, in its entirety and without leave to amend. The Clerk of the Court is directed to enter judgment accordingly and to close this case.